**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON,

               Respondent,

      v.

PATRICK LEON NICHOLAS,

               Appellant.

No. 85387-2-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Patrick Nicholas was convicted of murder in the first degree with sexual motivation based on his 1991 murder of 16-year-old Sarah Yarborough. Nicholas appeals his conviction arguing the State's DNA statistical evidence was inadmissible under Frye,[1] and that it was unconstitutional for police officers to obtain his DNA from a discarded cigarette butt. Nicholas also argues that his exceptional sentence is invalid. We remand for resentencing on the exceptional sentence. We otherwise affirm.

I

On December 14, 1991, Sarah Yarborough, a 16-year-old student at Federal Way High School (FWHS), planned to join her drill team for a competition. She arrived at FWHS approximately 45 minutes prior to the meeting time.

---

[1] Frye v. United States, 54 App. D.C. 46, 293 F. 1013, 1014 (1923).

Around 9:20 a.m., two 12-year-old boys were walking through FWHS grounds when they noticed a white male emerge from the hillside next to the parking lot. The boys noticed the man was wearing a long, dark trench coat; they locked eyes with him as the man began quickly walking away. The boys approached the area where the man emerged from and discovered a body of girl in a drill team uniform lying motionless on her back. The boys ran home and told their parents who then called the police.

Police officers arrived and found Yarborough lying in her drill team uniform. Her nylon stockings were wrapped around her neck in a ligature. Yarborough's underwear, bra, jacket, and socks were in a pile about three feet away from her body.

An autopsy revealed that Yarborough died as a result of ligature strangulation and blunt force injuries to her face. Semen was found on the items of clothing placed away from Yarborough's body. Washington crime lab DNA scientists developed a single male DNA profile from the semen on Yarborough's clothes.

For over 27 years, and despite over 4,000 tips, there was never a match to the male DNA profile found at the scene. Then, on September 27, 2019, detectives received a phone call from Dr. Colleen Fitzpatrick, a forensic genealogist. Fitzpatrick used the unknown DNA profile from the crime scene and genealogy comparisons to find a person of interest. She gave the detectives the names of two brothers with the last name Nicholas. One brother was already in the combined DNA index system (CODIS) from a prior conviction of rape in the first degree, so detectives immediately ruled him out as a potential killer. But Patrick Leon Nicholas was not in CODIS despite two prior convictions for rape in the first degree and one conviction for attempted rape in the first degree.

On September 29, 2019, detectives began undercover surveillance of Nicholas. Detectives observed Nicholas smoke two cigarettes outside a laundromat and then discard the cigarette butts on the ground. Detectives retrieved the cigarette butts and a napkin that fell out of Nicholas's pocket.

On October 2, 2019, it was confirmed that the unknown DNA left on Yarborough's clothes was a match to the DNA on Nicholas's discarded cigarette butts and napkin. Police arrested Nicholas on October 3, 2019.

Nicholas was charged with premediated murder in the first degree (count 1), felony murder in the first degree predicated on attempted rape in the second degree (count 2), and felony murder in the second degree predicated on indecent liberties (count 3). All counts included allegations of sexual motivation.

Nicholas moved to suppress evidence gathered through the search of Nicholas's family tree and the collection and testing of the discarded cigarette butts. Nicholas asserted that genetic information is a private affair and thus protected by article I, section 7. Accordingly, Nicholas argued that the seizure and testing of his cigarette butt was an improper warrantless search.

The trial court concluded that Nicholas lost any privacy interest and relinquished his DNA when he voluntarily abandoned his cigarette butt outside the laundromat. The court concluded that no subsequent search warrant was needed to test and to compare the DNA from the abandoned items to the DNA from the crime scene.

Nicholas also requested a Frye hearing to determine the admissibility of statistical calculations the Washington State Patrol Crime Lab (WSPCL) developed to explain the significance of the DNA match. After hearing testimony from experts for

both sides, the trial court concluded that the State's calculations for the significance of a scientific match was widely regarded in the relevant scientific forensic community as the appropriate scientific calculation.

A jury found Nicholas guilty of murder in the first degree and murder in the second degree. The jury acquitted Nicholas of the crime of murder in the first degree premediated.[2]

The trial court imposed an exceptional sentence of 548 months on count two based on the jury's special verdict finding that the crime was sexually motivated.

Nicholas appeals.

II

Nicholas argues that the trial court erred in admitting the State's calculation of the significance of a DNA match in this case because it was inadmissible under Frye. We disagree.

A

DNA is commonly referred to as our genetic blueprint that is passed down from parents to children. Forensic DNA testing assumes that while humans share 99 percent of the same DNA, there are specific locations on the human genome that vary significantly among individuals, which can be tested to find potential matches.

After a profile has been identified as a possible source of DNA, the calculation must be accompanied by a statistic that explains the strength of the match. There are different types of calculations that can be used, including Random Match Probability

---

[2] The trial court vacated the conviction for murder in the second degree based on double jeopardy.

(RMP). The RMP is the probability that an unrelated person randomly chosen from the population is included as a potential contributor of the mixed DNA profile.

Here, WSPCL's forensic scientist, Jennifer Venditto, reported statistical calculations using the RMP method. Venditto determined the DNA obtained from the crime scene matched Nicholas and the probability an unrelated individual at random from the U.S. who had a matching profile was 1 in 120 quadrillion.

Nicholas requested a <u>Frye</u> hearing arguing the State's statistical calculation was not generally accepted in the scientific community when the suspect is initially identified through a database search. He did not dispute that the RMP is a generally accepted method, but he argued that the RMP needs to be adjusted if a suspect is first identified through a database.

At the <u>Frye</u> hearing, Dr. Daniel Krane testified for the defense. He is a biology professor at Wright State University and an owner of a consulting business that assists individuals, typically defendants, "who want to have better understanding about issues pertaining to forensic DNA profiling." Dr. Krane testified that the RMP statistic needs to be adjusted to reflect that a database was initially used to identify Nicholas. He testified that an adjustment is necessary in these situations to address "ascertainment bias," explaining:

> But the way that an individual is identified as a suspect can have a very dramatic impact on how impressed we should be that we subsequently find that their DNA profile matches.
>     . . . .
>
> There are a number of analogies that might be of help. The—the issue here is ascertainment bias. The difference between a probable cause type of DNA profile case, typical, and a cold hit case is how it is that a suspect was identified. In statistical parlance, that can be described as

ascertainment bias. How somebody was ascertained. For a probable cause case, there is no ascertainment bias. For a cold hit case, there is ascertainment bias.

How much of an impact that ascertainment bias has is directly proportional to the size of the database that is being trawled. So an analogy that I think very directly applies would be the sort of thing you might encounter with purchasing lottery tickets. I understand Washington State has a state lottery. Let's just say that, you know, that there's a one in a 5 million—that there are a million different numbers that you might choose when you're playing the Washington lottery. And that you, therefore, have about a one in a million chance of picking a winning number.

If you tell your friends, ["]Hey, I have a winning lottery ticket,["] they will be impressed, right? How impressed will they be? Well, it's like a one in a million kind of odds that you would have chosen the right number. They would be one in a million kind of impressed.

But how impressed your friends might be should be different if you also then tell them all, I had purchased a hundred thousand lottery tickets, right? Each with a different number. Now you have got a one in ten chance of having the right number. They should be a whole lot less—a one hundred thousand times less impressed because of the way that you happened to have come upon that winning lottery ticket.

So in much the same way, if you search a database with one million people's DNA profiles in it and you find a person that matches from searching that database, you know, by one way of thinking, you should be about a million times less impressed to find that person's DNA profile matches the DNA profile from an evidence sample.

Dr. Krane testified to solve the issue of ascertainment bias, the appropriate statistical calculation is "Database Match Probability" (DMP). He explained that in 1996 the National Research Council II (NCR II) identified the problem of ascertainment bias and proposed the DMP calculation. This calculation considers the database size in order to resolve ascertainment bias.

Dr. Krane testified that the NCR II has not made another recommendation regarding adjusting the RMP since 1996. He was unaware of any peer reviewed,

scientific literature that proposes remedying ascertainment bias from a genealogical search in terms of the statistical weight of a DNA match. Dr. Krane was also unaware of any state crime labs in the U.S. that regularly calculate the DMP statistic rather than the RMP statistic. He added that the FBI does not make any adjustment to RMP without request. Despite these theories existing since the 1990s, Dr. Krane conceded that no labs have implemented a practice of adjusting RMP when there was a prior database search.

Sean Carhart, a DNA technical leader for the WSPCL, testified that the Scientific Working Group on DNA Analysis Methods (SWGDAM) is a group of professionals that work in forensic DNA testing, and their main role is to recommend updates to the FBI's quality assurance standards and guidelines for best practices in forensic DNA testing. Carhart testified that neither the FBI or SWGDAM recommend that it is necessary to adjust the RMP when the individual is initially identified in a database search.

Venditto, a forensic scientist with the WSPCL, testified that WSPCL does not adjust the RMP if a suspect was initially identified through a database search because "the statistical questions are that it's related to the evidence item. And that evidence item profile is the same and hasn't changed no matter how the reference sample was identified."

The trial court entered findings of fact and conclusions of law addressing the admissibility of statistical calculations for DNA evidence. The court concluded that the State's calculations for the significance of a scientific match was widely regarded in the relevant scientific forensic community as the appropriate scientific calculation, even when the suspect is first identified through a database search. The trial court explained:

> The particular issue raised by Defense about the appropriate question to be asked and answered by statistical calculations when a genetic genealogy database was used, in part, to identify Nicholas as a suspect, are matters of weight that can be explored at trial. These topics can be addressed on cross-examination and through the use of defense expert testimony.

The trial court denied Nicholas's motion to exclude the State's statistical calculations under Frye.

B

Nicholas asserts that the trial court erred in concluding the State's calculations were admissible under Frye. Nicholas argues that there is no generally accepted method of calculating a coincidental match probability following a cold hit in a genealogy database. He also argues that the trial court misapplied the Frye standard by restricting the relevant scientific community to the forensic community.

Washington courts apply the Frye standard to determine the admissibility of novel scientific evidence. State v. Copeland, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). The primary objective under Frye is to determine whether the evidence being offered is based on established scientific methodology. State v. DeJesus, 7 Wn. App. 2d 849, 859-60, 436 P.3d 834 (2019). To make a determination under Frye, the court considers (1) whether the underlying theory is generally accepted in the scientific community and (2) whether there are techniques, experiments, or studies using that theory which are capable of producing reliable results and are generally accepted in the scientific community. Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 603, 260 P.3d 857 (2011) (quoting State v. Riker, 123 Wn.2d 351, 359, 869 P.2d 43 (1994)). We review a trial court's Frye determination de novo. Copeland, 130 Wn.2d at 255-56.

We do not review whether a particular scientific theory is correct, but our review is whether the theory is generally accepted in the scientific community. Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co., 176 Wn. App. 168, 175-76, 313 P.3d 408 (2013). To determine whether a consensus of scientific opinion has been achieved, we examine expert testimony, scientific writings that have been subject to peer review and publication, secondary legal sources, and legal authority from other jurisdictions. Eakins v. Huber, 154 Wn. App. 592, 599, 225 P.3d 1041 (2010). Lastly, unanimity among the scientific community is not required, and the court should exclude expert opinion only if there is a significant dispute among qualified experts. Erickson v. Pharmacia LLC, 31 Wn. App. 2d 100, 148, 548 P.3d 226 (2024).

C

The State's statistical calculations regarding the significance of a DNA match in this case are admissible under Frye.

First, Dr. Krane testified himself that he was unaware of any crime lab that automatically calculates the DMP when the suspect is first identified through a database search. Additionally, the SWGDAM has made no recommendations about adjusting the RMP, although it is aware of the DMP calculation. The practice of crime labs across the country and the FBI is consistent with the WSPCL's practice.

Second, the database search was used to develop an investigative lead. After receiving the investigative lead that Nicholas was possibly a suspect, the officers obtained his DNA from abandoned property, and obtained probable cause to arrest him. The WSPCL then used the DNA from Nicholas's post arrest cheek swab to make the statistical calculations. Thus, the initial DNA search was irrelevant because the

statistical calculation was based on the cheek swab that WSPCL took after Nicholas's arrest.

Third, other jurisdictions agree that the RMP statistic is admissible under <u>Frye</u>, even when the suspect was first identified through a database search. For example, in <u>Jenkins</u>, the court analyzed the same argument made by Nicholas under <u>Frye</u>. <u>United States v. Jenkins</u>, 887 A.2d 1013, 1017 (D.C. 2005). In that case, the defendant argued the RMP statistic is not generally accepted in the scientific community for a cold hit case, and DMP is more accurate to address ascertainment bias. <u>Jenkins</u>, 887 A.2d at 1018. The court held and explained:

> More importantly, there is no controversy in the relevant scientific community as to the accuracy of the various formulas. In other words, the math that underlies the calculations is not being questioned. Each approach to expressing significance of a cold hit DNA match accurately answers the question it seeks to address. The rarity statistic[3] accurately expresses how rare a genetic profile is in a given society. Database match probability accurately expresses the probability of obtaining a cold hit from a search of a particular database. . . . These competing schools of thought do not question or challenge the validity of the computations and mathematics relied upon by the others. Instead, the arguments raised by each of the proponents simply state that their formulation is more probative, not more correct. Thus, the debate cited by Mr. Jenkins is one of relevancy, not methodology; and because . . . <u>Frye</u> . . . focus[es] on whether the methodology is generally accepted, there is no basis . . . to exclude the DNA evidence in this case.

<u>Jenkins</u>, 887 A.2d at 1022-3. Multiple other courts have held that the RMP is relevant and admissible because it accurately expresses the frequency in which a particular DNA profile appears in the general population even if the suspect was first identified through a database. <u>See</u> <u>Commonwealth v. Bizanowicz</u>, 459 Mass. 400, 408, 945

---

[3] The "rarity statistic" is the same calculation as the RMP. <u>See</u> <u>Jenkins</u>, 887 A.2d at 1018.

N.E.2d 356 (2011); People v. Nelson, 43 Cal. 4th 1242, 1263, 185 P.3d 49, 78 Cal.

Rptr. 3d 69 (2008); United States v. Davis, 602 F. Supp. 2d 658, 677 (D. Md. 2009).

We agree with these other jurisdictions that the RMP calculation meets the threshold of admissibility under Frye. The methodology of calculating the RMP is not disputed by the parties. Rather, it is how much weight the statistic should be given if the suspect is initially identified through a database search. Weight and methodology are different issues. The weight of a statistic is not a Frye issue.

Fourth, Nicholas was able to, and did, effectively cross-examine the State's witnesses about the statistical calculation. For example, Nicholas conducted the following cross-examination on Carhart:

> [Q]: It would be fair to say that your position is that [RMP] isn't the only possible relevant statistic; correct?
> [A]: That's correct.
> [Q]: Different statistics answer different questions?
> [A]: That's correct.
> [Q]: The database statistic might answer a question that you have about a database?
> [A]: Yes.
> [Q]: And so, if that was the relevant question in any given situation, that would be the relevant statistic?
> [A]: Yes. It could be [the] relevant statistic depending on the situation.
> [Q]: Right. It comes down to whatever—what you want to answer; right?
> [A]: Correct.
> [Q]: If you are trying to answer the question of what are the chances of a false match in a database, the database statistic is the right statistic; correct?
> [A]: I guess—I don't know if we have defined what the database statistic is . . . [t]hat is a different question. So you could theoretically, answer it using a statistical method if there was one.

Nicholas also effectively cross-examined Venditto about the statistic:

> [Q]: And when you get a conclusion as a potential contributor, you have to develop these match statistics; correct?
> [A]: Yes.

. . . .

[Q]: And ultimately, the real question we are really trying to ask is does this show we have the right person? Or is it possible that its not the right person? Correct? How strongly can you say it is the right person?
[A]: The statistic that we generate to go along with inclusionary or match statistics—those are meant to give weight to those conclusions.
[Q]: and you would agree with the proposition that the question depends on the situation and the question you are trying to answer; correct?
[A]: Yes.
[Q]: And all of these different statistics have—are a correct answer in their right application answering the question that they are trying to answer?
[A]: All of the statistical methods have their appropriate uses—yes.

Nicholas also presented his own witness, Dr. Krane, to explain the DMP calculation and the risk of ascertainment bias. As the trial court concluded, the DMP calculation goes to weight and relevance. It does not change the admissibility of the RMP calculation under Frye.

Finally, the trial court properly considered the relevant scientific community. The trial court heard testimony from two scientists at the WSPCL who explained the RMP calculation is common practice for Washington as well as crime labs across the country. Both of the State's experts and Dr. Krane testified that SWGDAM does not recommend that the statistic needs to be adjusted. We review expert testimony, peer reviewed publication, and other legal authority from other jurisdictions to determine whether a theory is generally accepted, and all those sources lead us to conclude that the RMP is generally accepted in these cases. Huber, 154 Wn. App. at 599. Moreover, unanimity in the scientific community is not required. While there may be a dispute among Dr. Krane and others as to the appropriate calculation, because other DNA crime labs across the county and SWGDAM still use the RMP calculation when a suspect is first

identified through a database there is support for concluding the method is generally accepted in the scientific community.

Accordingly, the trial court did not err when it declined to exclude the statistics under Frye.

III

Nicholas next argues that the trial court erred in denying his motion to suppress the DNA collected from the discarded cigarette butt and napkin. We disagree.

We review a trial court's conclusions of law underlying a denial of a motion to suppress de novo. State v. Samalia, 186 Wn.2d 262, 269, 375 P.3d 1082 (2016).

Article I, section 7 of the Washington Constitution provides, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The "private affairs inquiry is broader than the Fourth Amendment's reasonable expectation of privacy inquiry." State v. Hinton, 179 Wn.2d 862, 868, 319 P.3d 9 (2014). A search occurs under the Fourth Amendment if the government intrudes on subjective reasonable expectation of privacy. Hinton, 179 Wn.2d at 868 (citing Katz v. United States, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). In contrast, under article I, section 7 a search occurs when the government disturbs, "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." Hinton, 179 Wn.2d at 868 (quoting State v. Myrick, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)).

We apply a two-step test to determine whether a violation of article I, section 7 has occurred: (1) whether the government intruded on a private affair, and if so, (2) whether the governmental conduct was justified by authority of the law. State v.

Bowman, 198 Wn.2d 609, 618, 498 P.3d 478 (2021). "The 'authority of law' required by article I, section 7 is a valid warrant unless the State shows that a search or seizure falls within one of the jealously guarded and carefully drawn exceptions to the warrant requirement." Hinton, 179 Wn.2d at 868-69. The State bears the burden of establishing by clear and convincing evidence that an exception applies. State v. Garvin, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009). Courts must suppress evidence obtained through an unconstitutional search. State v. Monaghan, 165 Wn. App. 782, 789, 266 P.3d 222 (2012).

One exception to the warrant requirement is searching voluntarily abandoned property. State v. Evans, 159 Wn.2d 402, 407, 150 P.3d 105 (2007). "Voluntary abandonment is an ultimate fact or conclusion based generally upon a combination of act and intent." Samalia, 186 Wn. App. at 276 (quoting Evans, 159 Wn.2d at 408). "A person voluntarily abandons property where, in leaving the property, they relinquish their reasonable expectation of privacy in it." State v. Garner, 26 Wn. App. 2d 654, 663, 529 P.3d 1053 (2023).

Washington courts have concluded that abandonment did not occur when the seized item is in an area where the defendant had a privacy interest. State v. Hamilton, 179 Wn. App. 870, 886, 320 P.3d 142 (2014) (holding the defendant did not voluntarily abandon her purse when she left it on the counter of her house); State v. Dugas, 109 Wn. App. 592, 596, 36 P.3d 577 (2001) (holding the defendant did not voluntarily abandon his jacket with narcotics in it when he placed it on the hood of his car while officers questioned him); Evans, 159 Wn.2d at 409 (holding the defendant did not abandon a briefcase when he kept it locked and closed in his truck). But Washington

courts have also concluded that abandonment does occur when the seized item was abandoned in an area where the defendant had no privacy interest. Samalia, 186 Wn. App. at 276 (holding the defendant voluntarily abandoned their cell phone after leaving it in car when fleeing the scene); State v. Hepton, 113 Wn. App. 673, 680-81, 54 P.3d 233 (2002) (holding the defendant voluntarily abandoned a garbage can and bags found at an abandoned house next door to the defendant).

Here, Nicholas abandoned the cigarette butts and napkin in an area where he did not have a privacy interest. He discarded the cigarette butts, and the napkin fell out of his pocket on a public sidewalk outside a laundromat. Nicholas did not have a privacy interest on the sidewalk or outside the laundromat.

Nicholas cites State v. Boland, 115 Wn.2d 571, 578, 800 P.2d 1112 (1990), to argue that a reasonable person does not expect to relinquish their DNA by simply disregarding an item with DNA on it. In that case, our Supreme Court held that the defendant's private affairs were unreasonably intruded upon when officers removed garbage from the trash can on the curb waiting for it to picked up by a garbage collector. Boland, 115 Wn.2d at 578. The court reasoned that average persons would find it reasonable to believe the garbage they place in their trash can will be protected from warrantless government searches. Boland, 115 Wn.2d at 578.

Boland is distinguishable. Here, Nicholas littered on a public sidewalk. He did not place the items in a trash can that was awaiting a third party to pick it up. Rather, Nicholas discarded items on a public sidewalk with no reasonable expectation that no one else would retrieve it.

Nicholas also argues the trial court erred when it did not consider his intent when he discarded the cigarette. Nicholas correctly notes that intent can be relevant to the abandoned property inquiry, but the inquiry is whether the defendant "showed an intent to recover property." Garner, 26 Wn. App. 2d at 665 (emphasis added). For example, in State v. Kealey, the court held that a defendant did not voluntarily abandon her purse when she left it on a department store couch and returned to the store five minutes later to look for it. 80 Wn. App. 162, 165, 173-74, 907 P.2d 319 (1995); see also State v. Birdsong, 66 Wn. App. 534, 538, 832 P.2d 533 (1992) (holding that evidence was insufficient to show defendant voluntarily abandoned property when the defendant moved out of rental home but left furniture in garage and retained his rental house keys.)

Here, there is no evidence that Nicholas intended to retrieve the discarded items. Because Nicholas voluntarily abandoned the cigarette butt and napkin, the trial court did not err in denying the motion to suppress.

IV

Nicholas argues that the trial court erred in imposing an exceptional sentence because it relied on a "clearly too lenient" aggravating factor that was not found by the jury. We agree.

A sentencing court may impose a sentence outside the standard range if there are substantial and compelling reasons for departing from the standard range. RCW 9.94A.535. If the jury finds beyond a reasonable doubt the existence of certain aggravating circumstances, the court may impose a sentence outside the standard range. RCW 9.94A.535(3). Further, "[w]henever a sentence outside the standard

sentence range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535.

Nicholas's offender score was 6, so the standard range sentence was 312 to 416 months. The trial court imposed an upward exceptional sentence of 548 months. The trial court's written order included three conclusions of law in imposing an exceptional sentence:

> 1. The purposes of the Sentencing Reform Act (SRA) include to ensure that punishment is proportionate to the seriousness of the offense and the offender's criminal history, to promote respect for the law by providing punishment that is just and to protect the public. Considering the purposes of the SRA, the facts of this case present substantial and compelling reasons that justify imposition of an exceptional sentence.
>
> 2. The Jury found that this was a sexually motivated crime. The facts of this case, particularly when viewed through the lens of Mr. Nicholas's criminal history, are particularly egregious. A standard range sentence does not appropriately reflect the seriousness of this crime.
>
> 3. Mr. Nicholas's criminal history score does not reflect fully his prior violent, predatory, sexual offenses. Given the facts of this case, a standard range sentence results in a presumptive sentence that is clearly too lenient. A sentence of 548 months, the top of the standard for someone with an offender score of 9, is just and appropriate.

(Emphasis added.) The trial judge also stated during sentencing:

> I find that there is, based upon the jury's answer to the special interrogatory and based upon the facts of this case as I have recounted them, and, in particular, this outrageous violation of a child—this outrageous sexual assault upon a child culminating in her murder—a basis for an exceptional sentence up.

Nicholas argues that the trial court erred in imposing an exceptional sentence on the "clearly too lenient" basis because that factor was not found by the jury. Nicholas concedes that the trial court also based the exceptional sentence on the sexual motivation aggravating factor, which was found by the jury; but, he argues, resentencing

is necessary because it is not clear the trial judge would impose the same sentence based on the sexual motivation factor alone aggravating factor alone. In response, the State agrees with Nicholas that "clearly too lenient" is an aggravating factor that must be found by the jury but asserts the trial court did not rely on that factor as an aggravating factor but rather in setting the length of the sentence.

We can affirm an exceptional sentence based on multiple aggravating factors even if one of the aggravating factors is invalid. State v. Weller, 185 Wn. App. 913, 930, 344 P.3d 695 (2015). If we overturn an aggravating factor but are "'satisfied that the trial court would have imposed the same sentence based upon a factor or factors that are upheld, it may uphold the exceptional sentence rather than remanding for resentencing.'" Weller, 185 Wn. App. at 930 (quoting State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003)). This rule often applies when the trial court expressly states that it would have imposed the same exceptional sentence based any single aggravating factor standing alone. See, e.g., Weller, 185 Wn. App. at 930; State v. Nysta, 168 Wn. App. 30, 54, 275 P.3d 1162 (2012). In sum, if a reviewing court is satisfied that the trial court would have imposed the same sentence based upon one valid factor, it may uphold the exceptional sentence. State v. Moses, 193 Wn. App. 341, 365, 372 P.3d 147 (2016).

Courts have remanded for resentencing, however, when the record was not clear that the trial court would have imposed the same sentence based on the valid aggravating factor alone. For example, in Weller, the sentencing court imposed an exceptional sentence based on two aggravating factors, deliberate cruelty and ongoing pattern, although ongoing pattern factor was an invalid aggravating factor. 185 Wn.

App. at 930. But the trial court did not "specifically state that it would impose the same length of sentence based on each of the aggravating factors standing alone." Weller, 185 Wn. App. at 930-31. Thus, the court remanded for resentencing because the court would need to speculate to hold that the trial court would have imposed the same exceptional sentence based on the deliberate cruelty factor alone. Weller, 185 Wn. App. at 931. Similarly, in State v. Perry, 6 Wn. App. 2d 544, 549, 431 P.3d 543 (2018), the court remanded for resentencing when the trial court made additional findings of fact not made by the jury and the court could not determine whether the trial court based its legal conclusion to impose the exceptional sentence solely on the jury's finding by special interrogatory.

As Nicholas argues and the State acknowledges, the clearly too lenient aggravating factor must be found by the jury—and it was not here. See State v. Flores, 164 Wn.2d 1, 20, 186 P.3d 1038 (2008) ("Unless an aggravating factor is established solely by the jury verdict or the defendant's stipulation, it cannot be used to support an exceptional sentence."). The trial court also did not use language that indicated the exceptional sentence was based solely on the sexual motivation aggravating factor found by the jury. We would need to speculate whether the trial court would have imposed the sentence on the sexual motivation aggravating factor alone.

We remand for resentencing on the exceptional sentence. We otherwise affirm.

No. 85387-2-I/20

Mann, J.

WE CONCUR: