[Nos. 44726-6-II; 44733-9-II.   Division Two.   February 18, 2015.]

THE STATE OF WASHINGTON, *Respondent*, v. JEFFREY W. WELLER, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. SANDRA D. WELLER, *Appellant*.

914

*Jodi R. Backlund* (of *Backlund & Mistry*); and *Oliver R. Davis* (of *Washington Appellate Project*), for appellants.

*Anthony F. Golik, Prosecuting Attorney,* and *Anne M. Cruser, Deputy,* for respondent.

¶1 MAXA, J. — Jeffrey Weller and Sandra Weller appeal their multiple convictions for various degrees of assault and unlawful imprisonment, as well as their exceptional sentences. The convictions arose from their abuse of their 16-year-old twins, which included multiple beatings with a board and food deprivation. The Wellers argue that the trial court erred in failing to suppress the board that officers seized from the Wellers' garage and that their exceptional sentences are invalid because their convictions could have been based on accomplice liability.

¶2 We hold that the trial court did not err in failing to suppress the board that officers seized from the Wellers' garage because the community caretaking function and plain view exceptions to the warrant requirement were applicable. We also hold that the deliberate cruelty aggravating factor was valid to support the trial court's exceptional sentence but the ongoing pattern of abuse aggravating factor was not. Because the record does not reveal whether the trial court would have imposed the same exceptional sentences based only on the deliberate cruelty aggravating factor, we must remand for resentencing. In the unpublished portion of this opinion we address and reject the Wellers' additional arguments regarding their convictions and sentences.

¶3 Accordingly, we affirm the Wellers' convictions, but we remand to the trial court for resentencing.

## FACTS

*Report of Abuse*

¶4 Sandra and Jeffrey Weller had six children in their care and under their custody: 16-year-old twins (CW, a boy,

and CG, a girl[1]) adopted by Sandra[2] and her former husband, two of Jeffrey's biological children, one of Sandra's biological children, and one biological child of Sandra and Jeffrey together. In early October 2011, the twins left their therapist a note reporting abuse from their parents, stating that they were fearful and asking for help. The therapist made a mandatory report to Child Protective Services (CPS).

¶5 On October 7, CPS investigator Margie Dunn visited the Weller residence and, after interviewing Jeffrey and Sandra, assessed that CW and CG were unsafe. Dunn left the Weller residence for safety reasons and called in the assistance of the Vancouver Police Department.

### Welfare Check

¶6 Officers Jensen and Aldridge and four other officers arrived at the Weller residence to conduct a welfare check. The officers believed their purpose was to evaluate the Weller home environment and the twins' credibility to determine whether the children should be removed and placed into protective custody.[3] One of the officers knocked on the front door and explained to Sandra that the purpose of their visit was to perform a welfare check on the children. The officers did not have a search warrant. Officer Aldridge asked if they could come inside and speak with Sandra and the children. Sandra stepped back from the door and the officers entered the house.

¶7 The officers attempted to talk privately with the twins. Officer Jensen and CW talked in one room. Officer Aldridge and CG talked in another room, and ultimately

---

[1] Since CW and CG were minors at the time of the commission of the crimes, we use their initials to identify them.

[2] We use the defendants' first names where appropriate to avoid confusion.

[3] RCW 26.44.050 gives law enforcement responding for a welfare check the statutory authority to determine whether or not children should be removed from their home environment into protective custody.

moved into the garage for greater privacy. Both children described being beaten repeatedly with a board.

## Discovery of the Board

¶8 Both officers and the twins ultimately went together into the garage to talk. The only purpose in going to the garage was for privacy. CG and CW started to look around for the board, although not at the officers' direction.

¶9 Officer Aldridge was standing in the same place as when she entered the garage when she looked around and saw a board leaning against the garage wall in plain view. She asked the children if that was the board used to beat them, and they replied that it was. Officers Jensen and Aldridge both reported that the board was in a position where they could clearly see it from where they were standing. Officer Jensen picked up the board, and both officers observed the board had a long groove in it as well as discoloration that appeared to be consistent with dried blood. Officer Aldridge estimated that at that time the officers had been at the Weller residence for 20 minutes, and she testified that they "had no idea that this was heading toward a criminal investigation." J. Weller Report of Proceedings (RP) (Jan. 31, 2013) at 185.

## Criminal Charges

¶10 Based on her observations, Officer Aldridge decided to remove the twins and the other children from the Weller residence. After speaking with the children, the State filed multiple charges against the Wellers, including several charges of second, third, and fourth degree assault, and several counts of unlawful imprisonment. The record is unclear on whether each was charged as both a principal and an accomplice. For most of the charges, the State alleged that each defendant's conduct manifested deliberate cruelty to the victims and was part of an ongoing pattern of abuse.

*Motion to Suppress the Board*

¶11 The Wellers moved to suppress the board, arguing that it was seized during an unlawful search of their residence without a warrant. They argued that the emergency aid exception to the warrant requirement was inapplicable because there was no immediate threat of injury to any persons and that entry into the house was a pretext for a search for evidence of a crime. The State responded that the officers' warrantless entry into the Weller residence was justified both by Sandra's consent and by law enforcement's community caretaking function, and that the seizure of the board from the Weller garage was justified under the plain view doctrine.

¶12 At the suppression hearing, Jeffrey assumed that the emergency aid exception applied, but argued that at the time the board was found the officers were conducting a criminal investigation rather than a welfare check. Sandra also argued that law enforcement had begun a criminal investigation by the time the officers had spotted the board in the Weller garage. The trial court denied the motion to suppress, concluding in a detailed oral ruling that the officers lawfully were in the garage under the community caretaking exception and that they were authorized to seize the board because it was in plain view. The trial court did not enter written findings of fact or conclusions of law following the suppression hearing.

*Convictions and Sentences*

¶13 The case proceeded to a jury trial. The jury found Jeffrey guilty on most counts, and the trial court sentenced him for five counts of second degree assault, one count of unlawful imprisonment, one count of third degree assault of a child, and two counts of fourth degree assault.[4] The jury

---

[4] Several of the additional counts Sandra and Jeffrey were convicted of were dismissed because they merged into the other convictions.

also found Sandra guilty on most counts, and the trial court sentenced her for four counts of second degree assault and one count of unlawful imprisonment.[5] For all of Jeffrey's and Sandra's convictions, the jury returned a special verdict form answering yes to the questions "Did the defendant's conduct during the commission of the crime manifest deliberate cruelty to the victim?" and "Was the crime part of an ongoing pattern of psychological or physical abuse of the victim manifested by multiple incidents over a prolonged period of time?" J. Weller Clerk's Papers (CP) at 151; S. Weller CP at 106.

¶14 The trial court imposed exceptional sentences of 240 months' confinement for both Sandra and Jeffrey. Both of the exceptional sentences were based on the jury's findings that the Wellers' conduct manifested deliberate cruelty to the victims and occurred as part of an ongoing pattern of abuse.

¶15 Jeffrey and Sandra appeal their convictions and their exceptional sentences.

## ANALYSIS

### A. WARRANTLESS SEIZURE OF THE BOARD

¶16 The Wellers argue that the officers seized the board used to beat CW and CG in an unlawful warrantless search of their garage, and therefore that the trial court erred in denying their CrR 3.6 motion to suppress the board. We disagree, and hold that the trial court did not err when it concluded that (1) the officers' entry into the garage to privately interview the children was lawful under the community caretaking function exception to the warrant requirement, and (2) the seizure of the board was lawful under the plain view exception to the warrant requirement.

---

[5] Sandra's appellate brief contends in its statement of facts that Sandra was convicted by complicity for her four counts of second degree assault. The jury verdicts do not state this.

### 1. Legal Principles

■■ ¶17 Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution prohibit warrantless searches and seizures unless one of the narrow exceptions to the warrant requirement applies. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of demonstrating that a warrantless search or seizure falls within an exception to the warrant requirement. *State v. Duncan*, 146 Wn.2d 166, 172, 43 P.3d 513 (2002).

■■ ¶18 The community caretaking function exception to the warrant requirement arises from law enforcement officers' community caretaking function and involves two aspects: officers rendering aid or assistance (emergency aid exception) or making routine checks on health and safety (health and safety check exception). *State v. Schultz*, 170 Wn.2d 746, 754, 248 P.3d 484 (2011); *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004); *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000). Another exception to the warrant requirement is the plain view exception, which allows officers to seize an object if they are lawfully present in a constitutionally protected area and the object is in plain view.[6] *State v. Hudson*, 124 Wn.2d 107, 114, 874 P.2d 160 (1994).

■■ ¶19 When reviewing the denial of a suppression motion, we determine whether substantial evidence supports the trial court's findings of fact and whether the findings support the conclusions of law. *Garvin*, 166 Wn.2d at 249. We review de novo the trial court's conclusions of law pertaining to the suppression of evidence. *Id.* Specifically, whether an exception to the warrant requirement applies is a question of law that we review de novo. *See id.*

---

[6] Another exception is consent. *State v. Ferrier*, 136 Wn.2d 103, 111, 960 P.2d 927 (1998). But the State does not argue that the Wellers consented to the officers' entry into their garage by opening the door and allowing them to come into their house. And mere acquiescence when officers enter a home does not constitute consent. *Schultz*, 170 Wn.2d at 757, 759.

## 2. Failure to Enter Written Findings and Conclusions

¶20 Sandra initially argues that the trial court erred by failing to enter written findings of fact and conclusion of law supporting its CrR 3.6 ruling. Although failure to enter findings of fact and conclusions of law is error, such error is harmless if the trial court's oral findings are sufficient to permit appellate review. *See State v. Bluehorse*, 159 Wn. App. 410, 423, 248 P.3d 537 (2011).

¶21 Here, the trial court provided a detailed oral ruling that included numerous oral factual findings regarding the officers' conduct and the events leading up to the seizure, and legal conclusions regarding the applicability of exceptions to the warrant requirement. As a result, we hold that the trial court's oral findings and conclusions are sufficient to permit appellate review.[7]

## 3. Community Caretaking Function Exception

¶22 The Wellers argue that the trial court erred in reaching a legal conclusion that the officers' presence in the Wellers' garage was lawful under the community caretaking function exception to the warrant requirement. We disagree.

### a. Two Aspects of Community Caretaking

¶23 Our Supreme Court has recognized a "community caretaking function" exception to the warrant requirement. *Thompson*, 151 Wn.2d at 802; *Kinzy*, 141 Wn.2d at 386. "This exception allows for the limited invasion of

---

[7] The State also argues that in oral argument of the CrR 3.6 suppression motion, the Wellers abandoned any arguments that (1) the emergency aid exception to the warrant requirement did not justify the officers' initial entry into their house, and (2) the plain view doctrine does not apply. As a result, the State claims that the Wellers are precluded from making these arguments on appeal. We disagree. The Wellers did argue below in Jeffrey's written motion (although not at oral argument) that the emergency aid exception was inapplicable, and the court ruled on that issue as well as the plain view issue. Accordingly, we hold that the Wellers did not waive their arguments on these issues.

constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance or when making routine checks on health and safety." *Thompson*, 151 Wn.2d at 802. As noted in *Thompson*, there are two aspects to the community caretaking function: (1) the emergency aid exception, *Schultz*, 170 Wn.2d at 754, and (2) the health and safety check exception.[8] *Kinzy*, 141 Wn.2d at 387. The emergency aid exception involves greater urgency and allows searches resulting in a greater intrusion. *Id.* at 386.

¶24 A search pursuant to the community caretaking function exception must be totally divorced from a criminal investigation. *Id.* at 385. The exception does not apply where an officer's primary motivation is to search for evidence or make an arrest. *State v. Williams*, 148 Wn. App. 678, 683, 201 P.3d 371 (2009).

¶25 Both the State and the Wellers focus on the emergency aid exception to the warrant requirement, but the trial court's oral ruling also could be interpreted as applying the more general exception for routine health and safety checks.[9] Because we decide this issue based on the health and safety check aspect exception as discussed below, we do not address the emergency aid exception.

### b. Health and Safety Check Exception

¶26 To invoke the health and safety check exception, the State must show that (1) the officer subjectively

---

[8] The cases have been less than clear about whether the community caretaking function exception and the emergency aid exception are synonymous or separate. However, *Kinzy* makes it clear that the community caretaking function exception involves both emergency aid and routine health and safety checks. 141 Wn.2d at 386-87. And our Supreme Court more recently noted that the emergency aid exception is a "subset" of the community caretaking exception. *State v. Smith*, 177 Wn.2d 533, 541, 303 P.3d 1047 (2013).

[9] The trial court ruled that the officers' search of the Wellers' garage was lawful because they were within the scope of their community caretaking function at the time. The trial court stated that the community caretaking function also was referred to as the "Health and Safety Emergency," which seems to merge the two separate exceptions. J. Weller RP (Feb. 1, 2013) at 287.

believed someone needed health or safety assistance, (2) a reasonable person in the same situation would believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched.[10] *Thompson*, 151 Wn.2d at 802. Next, the State must show that the encounter under this exception was reasonable, which depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a community caretaking function. *Id.* "When weighing the public's interest, this [c]ourt must cautiously apply the community caretaking function exception because of the potential for abuse." *Kinzy*, 141 Wn.2d at 391.

¶27 Here, the three requirements for application of the health and safety check exception clearly were satisfied. The officers subjectively and reasonably believed that the Weller children needed health or safety assistance. A trained CPS investigator relayed to the officers her professional opinion that the Weller children were not safe and were expressing severe fear. And the officers had a reasonable basis to associate the need for assistance with the Wellers' residence – the CPS official told them that the children were in the residence. Further, based on this information, the balancing process shows that the officers' initial entrance into the Weller residence was justified because the public's interest in having the officers perform a welfare check on the children outweighed the Wellers' privacy interests in the foyer of their residence. *See Thompson*, 151 Wn.2d at 802.

¶28 Once the officers moved into other rooms of the residence and ultimately to the garage, the Wellers' privacy interests became more significant – entering a residence's garage is more intrusive than entering the foyer. However, the trial court expressly found that the officers had no

---

[10] These also are the first three parts of the test for application of the emergency aid exception, which also includes three additional requirements. *Schultz*, 170 Wn.2d at 754-761.

pretextual purpose in entering the residence, that at all times they were engaged in the community caretaking function. These findings are supported by the evidence, which shows that the officers' only purpose in entering the Wellers' residence and later their garage was to carry out their community caretaking function. Specifically, the evidence shows that the officers were in the garage because they were trying to find a private place to interview the children in conjunction with their welfare check. Further, the trial court found that the officers simply "ended up in the garage." J. Weller RP (Feb. 1, 2013) at 288. Nothing in the record suggests that the officers were searching the garage or looking for evidence.

¶29 The trial court did not expressly state that it engaged in the balancing process required for application of the health and welfare check exception. Nevertheless, the trial court's factual findings support the conclusion that under the circumstances of this case, the officers' entry into the garage in order to properly conduct their welfare check outweighed the Wellers' privacy interest in their garage. Accordingly, we affirm the trial court's application of the community caretaking function to the officers' entrance into the Wellers' residence and garage.

### 4. Plain View Doctrine

¶30 The "plain view" exception to the warrant requirement applies when officers (1) have a valid justification for being in a constitutionally protected area, and (2) are immediately able to realize that an item they can see in plain view is associated with criminal activity. *State v. Hatchie*, 161 Wn.2d 390, 395, 166 P.3d 698 (2007). The test for determining when an item is immediately apparent for purposes of a plain view seizure is whether, considering the surrounding circumstances, the police can reasonably conclude that the item is incriminating evidence. *Hudson*, 124 Wn.2d at 118. Officers do not need to be certain that the item is associated with criminal activity – probable cause is sufficient. *See id.*

¶31 Here, we hold that the officers were lawfully present in the Wellers' garage. Further, the surrounding facts and circumstances allowed the officers to reasonably conclude that the board was evidence of a crime. The officers initially arrived at the scene where they were informed of the twins' CPS report, which alleged frequent beatings with a potentially bloody board. As the welfare check progressed, both twins reported separately to each officer that Jeffrey would periodically beat them with a board. Further, when the officers were in the garage, the children began to look for the board. And the children immediately confirmed that the board Officer Aldridge saw was in fact the board used to beat them.

¶32 The trial court did not enter any specific factual findings regarding plain view. However, these facts support the conclusion that the officers could have reasonably concluded after listening to the twins' reports that the board Officer Aldridge saw in the garage was the board used to beat the children and therefore was incriminating evidence. As a result, we hold that the plain view exception to the warrant requirement applied to the officers' seizure of the board. We affirm the trial court's denial of the Wellers' motion to exclude the board.

## B. EXCEPTIONAL SENTENCES

¶33 The Wellers argue the trial court erroneously imposed their exceptional sentences because the jury did not expressly find that the deliberate cruelty and ongoing pattern of abuse aggravating factors were based on principal liability as opposed to accomplice liability. We hold that the deliberate cruelty aggravating factor was a valid basis for the trial court's imposition of the exceptional sentences, but the ongoing pattern of abuse aggravating factor was not. Because we cannot determine from the record whether the trial court would have imposed the same exceptional

sentences based on only the deliberate cruelty aggravating factor, we must remand for resentencing.[11]

### 1. Deliberate Cruelty Aggravating Factor

■ ¶34 In order for the trial court to impose an exceptional sentence, the aggravating factor supporting the exceptional sentence generally must be based on the defendant's own conduct. *State v. Hayes*, 182 Wn.2d 556, 563-64, 341 P.3d 1144 (2015). As a result, an aggravating factor cannot be applied to an accomplice unless the accomplice's own conduct or knowledge of the principle's conduct informs the aggravating factor. *Hayes*, 182 Wn.2d at 563-64.

■ ¶35 The Wellers argue that this rule applies to the deliberate cruelty aggravating factor because the trial court's instructions allowed the jury to convict each of them as an accomplice. However, here there is no possibility that the jury found the aggravating factor for one of the Wellers based on the conduct of the other. Instead, for each charge of each defendant the jury was asked, "Did *the defendant's conduct* during the commission of the crime manifest deliberate cruelty to the victim?" *E.g.*, J. Weller CP at 151; S. Weller CP at 106 (emphasis added). And for each count the jury answered in the affirmative. Therefore, the trial court's imposition of an exceptional sentence based on the deliberate cruelty aggravating factor was based on Jeffrey's and Sandra's own conduct, regardless of whether their convictions were based on accomplice liability.

¶36 We hold that the deliberate cruelty aggravating factor was a valid basis for the trial court's imposition of the Wellers' exceptional sentences.

---

[11] The Wellers also argue that their exceptional sentences were based in part on judicial fact-finding, which violated their Sixth Amendment jury trial right. U.S. Const. amend. VI. We disagree. Here, the jury – and not the trial court – found the two aggravating factors. And the trial court expressly relied on those findings in imposing the exceptional sentences. Although the trial court ruled that the jury's findings were supported by the evidence, it properly was evaluating the evidence supporting the jury's findings before imposing the exceptional sentences.

## 2. Ongoing Pattern of Abuse Aggravating Factor

¶37 Unlike the deliberate cruelty aggravating factor, the jury's finding of the ongoing pattern of abuse aggravating factor for both Jeffrey and Sandra could have been based on each other's conduct. For each charge the jury was asked, "Was the *crime* part of an ongoing pattern of psychological or physical abuse of the victim manifested by multiple incidents over a prolonged period of time?" *E.g.*, J. Weller CP at 151; S. Weller CP at 106 (emphasis added). The jury answered in the affirmative. As a result, the jury did not specifically find that either Jeffrey or Sandra engaged in an ongoing pattern of abuse or that either Jeffrey or Sandra knew the other engaged in an ongoing pattern of abuse. *Hayes*, 182 Wn.2d at 564-65.

¶38 The State concedes that the ongoing pattern of abuse aggravating factor was not valid with regard to Sandra. We accept the State's concession. The court's instructions allowed Sandra to be convicted as an accomplice, and the jury did not find that either Sandra's conduct or her knowledge of Jeffrey's conduct informed the aggravating factor. *Hayes*, 182 Wn.2d at 564-65.

¶39 However, the State does not concede that the ongoing pattern of abuse aggravating factor is invalid as to Jeffrey. The State argues that based on the evidence, the jury could have convicted Jeffrey only as a principal and not as an accomplice. We disagree.

¶40 With regard to the beatings of the children, the children's testimony was that only Jeffrey administered those beatings while Sandra encouraged him. However, there also were other forms of abuse – such as withholding food from the children – for which the jury could have found that Sandra was the principal and Jeffrey was the accomplice. And the State chose to charge Jeffrey as an accomplice. Therefore, it is possible that the jury could have convicted Jeffrey as an accomplice to Sandra's abuse rather than convicting him as a principal for the beatings. Under

these circumstances, the jury's finding of the ongoing pattern of abuse aggravating factor as to Jeffrey could have been based on Sandra's conduct, and therefore was not a valid basis for the imposition of an exceptional sentence.

¶41 We hold that the ongoing pattern of abuse aggravating factor was not a valid basis for the trial court's imposition of an exceptional sentence for either Jeffrey or Sandra.

3. Exceptional Sentence Based on One Valid and One Invalid Factor

¶42 The State argues that as long as one aggravating factor supports the trial court's exceptional sentences, those sentences can be affirmed even though another aggravating factor supporting the exceptional sentence is held to be an invalid basis for imposing the sentences. The State argues that we should affirm the trial court's imposition of the exceptional sentence based solely on the deliberate cruelty aggravating factor. We disagree.

¶43 A reviewing court can affirm an exceptional sentence even though not every aggravating factor supporting the exceptional sentence is valid. "Where the reviewing court overturns one or more aggravating factors but is satisfied that the trial court would have imposed the same sentence based upon a factor or factors that are upheld, it may uphold the exceptional sentence rather than remanding for resentencing." *State v. Jackson*, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). This rule is particularly appropriate when the trial court expressly states that the same exceptional sentence would be imposed based on any one of the aggravating factors standing alone. *See State v. Nysta*, 168 Wn. App. 30, 54, 275 P.3d 1162 (2012).

¶44 Here, the trial court stated that both the deliberate cruelty aggravating factor and the ongoing pattern aggravating factor independently provided authority to order the exceptional sentence. However, the trial court did not specifically state that it would impose the same length of exceptional sentence based on each of the aggravating

factors standing alone. Therefore, the record is unclear as to how the trial court would have sentenced the Wellers if it had not considered the ongoing pattern aggravating factor.

¶45 Based on the record before us, we would need to speculate to hold that the trial court would have imposed the same exceptional sentences based on only the deliberate cruelty aggravating factor. Accordingly, we must remand to the trial court for resentencing.

## CONCLUSION

¶46 We affirm the Wellers' convictions, but we remand to the trial court for resentencing.

¶47 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J., and SUTTON, J., concur.

Review denied at 183 Wn.2d 1010 (2015).