# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 75022-4-I |
| Respondent, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| ROBERT JOHN PRESTON, | ) | UNPUBLISHED OPINION |
| Appellant. | ) ) | FILED: October 2, 2017 |
| | ) | |

LEACH, J. — Robert Preston appeals his conviction for unlawful possession of a firearm in the first degree. He challenges the trial court's denial of his motion to suppress evidence seized after his arrest. But Preston has not shown that he was unlawfully seized when two police officers investigated his identity during a social contact. The evidence also establishes that police officers properly seized a firearm in plain view while executing a search warrant for drugs. We affirm.

## BACKGROUND

The State charged Robert Preston with one count of unlawful possession of a firearm in the first degree. Before trial, Preston moved to suppress evidence seized after his arrest. After the suppression hearing, the trial court entered detailed CrR 3.6 findings of fact that Preston does not significantly challenge on appeal.

On the afternoon of July 3, 2015, a Mill Creek homeowner called 911 to report a suspicious car that had been parked near his home for two days. He said a white male wearing a blue tank top had been in the car, possibly sleeping. The homeowner did not see any weapons or tools. Mill Creek police officers Rodney Fleming and Todd Bridgman responded to the report in separate marked patrol cars.

Corporal Fleming arrived at the location shortly after 4:30 p.m. He saw a white two-door Pontiac Sunfire parked off the roadway on public property. Both the hood and the trunk lid of the Pontiac were open. The temperature was over 90 degrees, and the two door windows of the Pontiac were cracked open and draped with T-shirts. The rear windows were uncovered.

Fleming parked his patrol car about 30 yards away on the opposite side of the street and walked over to a white male, later identified as appellant Robert Preston, who appeared to be working under the hood of the car. The car's battery was disconnected and sitting on the engine block. Preston was not wearing a blue tank top and was using tools from a white bucket.

When Fleming asked what he was doing, Preston replied that he was attempting to fix the car by replacing the fuse box. Preston "kept moving" around and "tinkering" while he spoke with Fleming. Fleming explained that a concerned citizen had called the police about the car "and I was just wanting to find out if he was okay." Fleming ran the

car's license plate and learned that the Pontiac was registered to Manuel Gutma and was not reported as stolen.

Officer Bridgman arrived a few minutes after Fleming. He parked next to Fleming's car on the opposite side of the street and walked over to join Fleming.

Preston told the officers that the car did not belong to him. When Fleming asked his name, Preston said he was Shawn Preston and provided a birth date. When asked for identification, Preston said he did not have any. At some point, the officers pointed to a bulge in Preston's pocket, and Preston showed the officers his cell phone.

Fleming returned to his patrol car and contacted dispatch while Bridgman continued to talk with Preston. Fleming learned that Shawn Preston did not have any warrants or other holds. Fleming then used a computer terminal to access Shawn Preston's photo in the Department of Licensing (DOL) database. Fleming believed that the photo "looked similar to Preston but did not appear to be the same person." The photo indicated Shawn Preston had a neck tattoo.

Fleming returned to the car. There he determined that Preston did not have a tattoo. When Fleming asked what happened to the tattoo, Preston accurately described the tattoo and said that he had it "laser removed."

Bridgman went to the patrol car and looked at the DOL photo. Although he saw some similarities, Bridgman did not believe that the person in the photo was Preston. Bridgman walked back and told Preston that he believed Preston had given the officers

a false name, possibly the name of a relative, and suspected that Preston had active warrants. During the conversation, Preston became louder and more upset. At one point, he began yelling the names of Shawn Preston's parents. After Preston said he could not recall his social security number and provided an age that did not match his claimed date of birth, Bridgman went back to a patrol car to continue researching Preston's identity.

During the search, Bridgman found the name Robert Preston associated with Shawn Preston. One of the databases that Bridgman searched indicated that Robert Preston had outstanding warrants. After looking at Robert Preston's DOL photo, Bridgman walked back and said, "Robert, I know who you are."

Preston immediately began running toward a nearby residence. Bridgman quickly caught up to Preston, tackled him, and handcuffed him. A short time later, dispatch confirmed that Preston had outstanding warrants. The officers escorted Preston back, patted him down, and placed him in a patrol car. Preston refused Bridgman's request for consent to search the car and his cell phone. While waiting for a K9 unit to arrive, Bridgman looked through a window of the Pontiac and saw some tubing on the back seat that he believed to be drug paraphernalia.

Lynnwood K9 Officer Jacob Shorthill arrived with K9 Eli at about 5:46 p.m. K9 Eli "was certified and known to be reliable for detecting the odor of controlled substances." Eli was not trained to detect marijuana.

Shorthill looked through a window of the Pontiac at the back seat and saw what he believed to be a glass pipe with residue that was used to ingest controlled substances. K9 Eli alerted to the odor of controlled substances at the bottom seams of the driver and passenger doors. Bridgman then had the Pontiac impounded and towed to the Mill Creek Police Department secure storage facility.

Based on the officers' observations and the dog's positive alerts, Bridgman obtained a warrant to search the Pontiac for drug paraphernalia and controlled substances. While executing the warrant, Bridgman found a pillowcase behind the driver's seat containing a loaded firearm and a wallet. Because he knew that Preston was a convicted felon who was not allowed to possess a firearm, Bridgman seized the gun as evidence. Bridgman also searched the wallet, which contained several cards with Preston's name on them.

Preston testified at the suppression hearing. He claimed that someone had hired him to replace the fuse box and that the hood and trunk lid were open when he arrived. Preston expected someone to pick him up around 4:30 p.m. He acknowledged that he did not want the officers to learn his identity and that he had dropped his wallet into the car through a gap in the window when the officers arrived. Preston denied that he had access to the car's interior.

Preston moved to suppress. He contended, among other things, that the officers unlawfully seized him without reasonable suspicion once they learned the Pontiac was

legally parked and not stolen. He also claimed that the officers exceeded the scope of the warrant when they seized the firearm.

The trial court concluded that the officers had not seized Preston until they tackled and handcuffed him. The court denied the motion to suppress evidence involving seizure of the firearm, concluding that the officers properly seized the firearm under the "plain view" doctrine. The court suppressed evidence and several of Preston's statements not directly related to the firearm charge. A jury found Preston guilty as charged.

## ANALYSIS

Preston contends that officers Fleming and Bridgman unlawfully seized him no later than when Bridgman arrived on the scene and joined in the questioning. He asserts that the officers did not have a reasonable suspicion to detain him at this point. This made his continued detention unlawful. Preston asserts that but for this unlawful seizure, the officers would not have reviewed the DOL photo or discovered his true identity.

> Under article I, section 7 [of the Washington Constitution], a person is seized "only when, by means of physical force or a show of authority," his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances, or (2) free to otherwise decline an officer's request and terminate the encounter.[1]

---

[1] State v. O'Neill, 148 Wn.2d 564, 574, 62 P.3d 489 (2003) (citation omitted) (internal quotation marks omitted) (quoting State v. Young, 135 Wn.2d 498, 510, 957 P.2d 681 (1988)).

The standard is a "purely objective one, looking to the actions of the law enforcement officer."[2] Preston bears the burden of proving that he was seized in violation of article I, section 7.[3]

Whether police have seized a person is a mixed question of law and fact.[4] We review the record to decide if substantial evidence supports challenged findings entered after a suppression hearing; unchallenged findings are verities on appeal.[5] The ultimate determination of whether the facts constitute a seizure is a question of law that we review de novo.[6]

Not every encounter between a police officer and a citizen is sufficiently intrusive to require an objective justification.[7] A "social contact" does not constitute a seizure.[8] A social contact "occupies an amorphous area in our jurisprudence, resting someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention (i.e., Terry stop)."[9] Police officers may "engage persons in conversation and ask for identification even in the absence of an articulable suspicion of wrongdoing."[10]

---

[2] Young, 135 Wn.2d at 501.
[3] Young, 135 Wn.2d at 510.
[4] State v. Harrington, 167 Wn.2d 656, 662, 222 P.3d 92 (2009).
[5] O'Neill, 148 Wn.2d at 571.
[6] Harrington, 167 Wn.2d at 662.
[7] State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004).
[8] Harrington, 167 Wn.2d at 664-65.
[9] Harrington, 167 Wn.2d at 664 (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).
[10] Young, 135 Wn.2d at 511.

Circumstances that may bear upon whether police actions escalate a social contact into a seizure include, but are not limited to, the presence of several officers, the display of weapons, the physical touching of a suspect, and the use of language or a tone of voice suggesting that compliance with the officer's request might be compelled.[11] "'In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure.'"[12]

Preston contends that even if the encounter with Corporal Fleming began as a social contact, the basis for the social contact disappeared once he explained his purpose and Fleming determined the car was not stolen. He argues that the encounter escalated into a seizure "at the moment the second officer arrived and continued questioning" and that a "reasonable person would, at this point, realize he was under investigation and was not free to leave." We disagree.

The encounter between the officers and Preston occurred during daylight hours on public property. Both Fleming and Bridgman parked their patrol cars some distance away from the Pontiac on the opposite side of the street and approached Preston on foot. Neither vehicle restricted Preston's ability to leave.

---

[11] Young, 135 Wn.2d at 512.

[12] Young, 135 Wn.2d at 512 (quoting United States v. Mendenhall, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)).

Fleming, who arrived first, told Preston the reason for the contact, asked if he was okay, and chatted briefly about auto repairs before checking the license plate number and determining that the car was not stolen. Fleming's request for identification did not convert the encounter into a seizure.[13]

The "'threatening presence of several officers'" or the "'display of a weapon'" may convert a casual encounter into a seizure.[14] But the mere presence of several armed officers does not automatically constitute a seizure.[15]

Here, although both Fleming and Bridgman were armed, neither officer displayed a weapon. Moreover, for much of the encounter, only one of the officers was present to speak with Preston while the other was in a patrol car. Preston concedes that the officers never blocked his path, touched him, or told him that he was not free to leave. Nor at the time of the alleged seizure had the officers taken possession of Preston's property, attempted to control his conduct, used accusatory language or a threatening tone of voice, or made any overt show of force. Rather, at this point, the officers had merely approached Preston, discussed the circumstances, and asked for identification.

---

[13] See O'Neill, 148 Wn.2d at 578-81 (officer's illumination of car's interior with a flashlight and request for occupant to roll down window and provide identification did not constitute seizure).

[14] Young, 135 Wn.2d at 512 (quoting Mendenhall, 446 U.S. at 554-55).

[15] See State v. Smith, 154 Wn. App. 695, 700, 226 P.3d 195 (2010) (officer's questioning in the presence of multiple officers did not constitute seizure where officers' conduct was not threatening).

The trial court found that at some point, the officers "pointed" to a bulge in Preston's pocket and Preston "showed them it was his cell phone." But nothing in the record indicates precisely when this occurred or demonstrates that the officers were compelling Preston's response or that the gesture was sufficiently intrusive to change the nature of the contact. Preston also relies on his testimony at the suppression hearing that Fleming requested permission to pull the hood down to see the license plate. But the trial court entered no findings suggesting that the officers had to move anything to see the license plate.[16]

Preston's arguments rest heavily on the assertion that the reason for the social contact dissipated once the officers learned that Shawn Preston had no outstanding warrants and the car was not stolen. But in researching Preston's identity, the officers noted a discrepancy in his appearance resulting, in part, from the missing tattoo. Preston has cited no authority suggesting that the officers were required to ignore the discrepancy or that further nonintrusive attempts to learn his identity changed the encounter into a seizure.

When we view the circumstances here in their entirety, we do not find them comparable to those involving a display of authority or the type of progressive intrusion

---

[16] See State v. Armenta, 134 Wn.2d 1, 14, 948 P.2d 1280 (1997) ("In the absence of a finding on a factual issue we must indulge the presumption that the party with the burden of proof failed to sustain their burden on [that] issue.").

that would lead a reasonable person to believe he or she was not free to leave.[17] Preston has not shown that he was unlawfully seized when Officer Bridgman arrived and participated in the encounter.

Preston next challenges the trial court's conclusion that the firearm was properly seized under the "plain view" doctrine. He argues the firearm was not immediately recognizable as contraband because Officer Bridgman seized the gun before he saw Preston's name on the cards in the wallet. Because he was not the registered owner of the car, was not wearing the blue tank top that the homeowner reported seeing, did not have any keys, and was not seen inside the car, Preston maintains the remaining evidence was insufficient to suggest that he either possessed or controlled the gun. The State maintains that Bridgman found the firearm and wallet "almost simultaneously."

"The 'plain view' exception to the warrant requirement applies when officers (1) have a valid justification for being in a constitutionally protected area, and (2) are immediately able to realize that an item they can see in plain view is associated with

---

[17] See, e.g., Harrington, 167 Wn.2d at 669-70 (arrival of second officer, requests that the defendant remove his hands from his pocket "to control" his actions, and a request to frisk without articulable facts constituted "progressive intrusion" culminating in seizure); State. v. Soto-Garcia, 68 Wn. App. 20, 25, 841 P.2d 1271 (1992) (inquiry about identification, warrant check, direct question about drug possession, and request to search constituted seizure), abrogated on other grounds by State v. Thorn, 129 Wn.2d 347, 917 P.2d 108 (1996).

criminal activity."[18] An object is immediately recognizable for purposes of the plain view doctrine "when, considering the surrounding circumstances, the police can reasonably conclude that the substance before them is incriminating evidence."[19] "Officers do not need to be certain that the item is associated with criminal activity—probable cause is sufficient."[20] Preston does not challenge the lawfulness of the warrant or Bridgman's search of the pillowcase while executing the warrant.[21]

A person commits unlawful possession of a firearm if, after having been convicted of certain felonies, he or she possesses or controls a firearm.[22] Possession of a firearm may be actual or constructive.[23] Constructive possession "can be established by showing the defendant had dominion and control over the firearm or over the premises where the firearm was found."[24] The State need not prove exclusive control.[25]

Upon arriving to investigate the suspicious car, Fleming and Bridgman were aware that a nearby homeowner reported the car had been there for two days and someone may have been sleeping in it. Both front windows were cracked open and

---

[18] State v. Weller, 185 Wn. App. 913, 926, 344 P.3d 695 (2015), review denied, 188 Wn.2d 1017 (2017).

[19] State v. Hudson, 124 Wn.2d 107, 118, 874 P.2d 160 (1994).

[20] Weller, 185 Wn. App. at 926.

[21] See State v. Chambers, 88 Wn. App. 640, 645, 945 P.2d 1172 (1997) ("Officers executing a warrant for [drugs] are authorized to inspect virtually every aspect of the premises.").

[22] RCW 9.41.040(1)(a), (2)(a).

[23] State v. Lee, 158 Wn. App. 513, 517, 243 P.3d 929 (2010).

[24] State v. Echeverria, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997).

[25] State v. Bowen, 157 Wn. App. 821, 828, 239 P.3d 1114 (2010).

draped with T-shirts, indicating that someone had been in the car and attempted to shade the interior from the heat.

Preston was the only person present and was undertaking significant electrical repairs. The fact that both the hood and trunk were open suggested that Preston had entered the car to begin the repairs and had further access to the car to complete and test the repairs. At the time he found the firearm, Bridgman knew that Preston was a convicted felon who was not permitted to possess a firearm.[26]

Even though Preston was not wearing a blue tank top when the officers arrived, the officers executing the search warrant could reasonably believe that he was the person the homeowner had seen and that he had exercised dominion and control over the contents of the car. Substantial evidence supports the trial court's determination that the firearm was immediately recognizable as contraband under the plain view doctrine.

Preston asks that we not impose appellate costs if we affirm his conviction. The State has informed the court that it will not seek appellate costs because of Preston's

---

[26] See United States v. Folk, 754 F.3d 905, 912 (11th Cir. 2014) ("A firearm that reasonably appears to be in the possession of a convicted felon qualifies as contraband—and is therefore subject to seizure under the plain view doctrine.").

continued indigency. We accept the State's representation. Thus, we need not otherwise address appellate costs.

Affirmed.

_____
Leach, J.

WE CONCUR:

_____
Spearman, J.

_____
Appelwick, J.

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 OCT -2 AM 9: 06