# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>v.<br><br>PHUONG VIEN MAI,<br><br>     Appellant. | No. 78656-3<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: January 21, 2020 |

PER CURIAM — Phuong Mai appeals his conviction for first degree unlawful possession of a firearm. He challenges the trial court's denial of his motion to suppress a firearm recovered by community corrections officers during a warrantless search of his residence. Mai contends the search was unlawful, arguing that the nexus between his community custody violation and the property searched was insufficient and the information precipitating the search was stale.

Because the evidence supported a reasonable belief that the search location had a nexus to the community custody violation, and because the evidence was not stale, we affirm.

## BACKGROUND

In 2016, Mai began serving a 12-month term of community custody for several drug convictions. His community custody conditions prohibited him from possessing a firearm and authorized Community Corrections Officer (CCO) Tyler D'Souza to search Mai' "person, residence, automobile, or other personal property if there is reasonable cause . . . to believe he/she has violated the conditions/requirements of supervision."

1

In October 2016, Roman Casino Surveillance Observer Gus Routos reported to the Washington State Gambling Commission that a casino employee saw Mai drop a gun on the floor and put it back in his pants. The report included Mai's name, driver's license number, date of birth, and last known address. Routos reported that two other casino employees told Mai to take the gun out of the casino to his car, which he did.

Keith Kam, a Special Agent at the Gambling Commission, received Routos' report and casino surveillance footage. He filed a case report describing what he observed in the footage. He described "a black semi-automatic style handgun laying on the floor next to Mai's chair." Mai "picked up the firearm and discreetly [put] it in the front waistband of his pants." Kam later testified to the contents of the video at the pretrial suppression hearing.

When Kam learned that Mai was on community custody, he sent his report to the Washington State Department of Corrections. On December 15, 2016, CCO D'Souza reviewed the report and had "huge safety concerns". He testified at the suppression hearing that an offender in possession of a firearm is "something you need to act on quick to make sure that . . . the community's safe, your team's safe" when "home visits are conducted or the offender comes . . . for an office visit."

Within hours of reviewing the report, CCO D'Souza and three other officers searched Mai's residence and found a black handgun. D'Souza arrested Mai and read him his Miranda rights. The CCOs resumed searching Mai's residence and vehicle and found controlled substances and large amounts of cash.

The State charged Mai with attempted first degree unlawful possession of a firearm. Mai moved to suppress the fruits of the search of his residence and vehicle. Following a hearing, the court upheld the portion of the search leading to the discovery of the firearm, concluded that the subsequent search was unlawful and that the drugs found in that portion of the search should be suppressed, and entered the following conclusions of law:

> (c) There is a nexus between the handgun found in the defendant's house and the suspected probation violation, so the gun found in the defendant's residence is admissible.
>
> . . .
>
> (e) The information that led to the search on or about December 15, 2016, was not stale.
>
> . . .
>
> (h) The nexus test is more of a locational test than a temporal test. Based upon the type of contraband, in this case a weapon, the CCO's search of the defendant's residence was proper and not stale.

Following a stipulated bench trial, the trial court convicted Mai as charged. He appeals.

## STANDARD OF REVIEW

In reviewing a trial court's denial of a motion to suppress, we determine whether substantial evidence supports the challenged factual findings and whether the findings support the court's conclusions of law.[1]   When, as here, the findings are unchallenged, we accept them as true on appeal.[2] We review de novo whether the findings support the conclusions of law.[3]

---

[1] State v. Russell, 180 Wn.2d 860, 866, 330 P.3d 151 (2014).

[2] Zunino v. Rajewski, 140 Wn. App. 215, 220, 165 P.3d 57 (2007); State v. Fry, 168 Wn.2d 1, 5, 228 P.3d 1 (2010).

[3] Zunino, 140 Wn. App. at 220; State v. Weller, 185 Wn. App. 913, 922, 344 P.3d 695, (2015).

3

ANALYSIS

Mai contends the court erred in failing to suppress the firearm because there was an insufficient nexus between the community custody violation and the search of his residence, and because the information precipitating the search was stale by the time the search was executed. We disagree.

Under article 1, section 7 of the Washington State Constitution, individuals have "a robust privacy right" that protects them from being disturbed in their private affairs or having their home invaded without authority of law.[4] Offenders on community custody, however, do not enjoy the full protection of this right.[5] Their expectation of privacy is reduced because they are "serving their time outside the prison walls."[6] Accordingly, a CCO can conduct a warrantless search of a supervisee/probationer's person, residence, automobile, or other personal property if the CCO has reasonable cause to believe that the person violated the conditions of community custody.[7] The location to be searched must be limited, however, "to property *reasonably believed to have a nexus* with the suspected probation violation."[8] (Emphasis added.)

---

[4] State v. Cornwell, 190 Wn. 2d 296, 301, 412 P.3d 1265, 1268 (2018).

[5] Cornwell, 190 Wn.2d at 301.

[6] Cornwell, 190 Wn.2d at 301 (quoting State v. Olsen, 189 Wn.2d 118, 124-25, 399 P.3d 1141 (2017)).

[7] Cornwell, 190 Wn.2d at 302.

[8] Cornwell, 190 Wn.2d at 306. Given the diminished expectations of privacy in CCO searches of probationers/supervisees and the reasonable suspicion standard generally applied to such searches, the "reasonably believed" language in Cornwell connotes a reasonable suspicion standard for establishing a nexus.

For example, in Cornwell, the court determined there was no nexus between a defendant's failure to report to his CCO and a search of his vehicle. The CCO had "no expectation that the search would produce evidence of Cornwell's failure to report."[9] By contrast, the court in State v. Parris[10] determined a nexus existed when an offender's mother notified his CCO that he may have obtained a firearm in violation of his probation. An officer searched the offender's room and digital memory cards and found photos of guns on the cards. Commenting on Parris, the Cornwell court concluded that a nexus between the memory cards and a suspected violation was undoubtedly satisfied because the CCO "believed she might find evidence of [an illegal firearm]" on the cards.[11]

Here, it is undisputed that Mai possessed a firearm in the casino in violation of his community custody conditions. When casino employees approached him, he took the gun back to his car. Nothing in the record suggests that Mai intended to relinquish possession of the gun at any point after he left the casino. Significantly, courts have held that, unlike drugs and other consumables, guns are likely to be found at an individual's home.[12] In the circumstances presented here,

[9] Cornwell, 190 Wn.2d at 306.
[10] State v. Parris, 163 Wn. App. 110, 259 P.3d 331 (2011).
[11] Cornwell, 190 Wn.2d at 305.
[12] State v. Condon, 72 Wn. App. 638, 644, 865 P.2d 521 (1993); State v. Groves, No. 32961-5-III, Wash. Ct. App. Feb. 23, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/329615_ord.pdf, as amended on denial of reconsideration (May 16, 2017), review denied, 189 Wn.2d 1016, 404 P.3d 488 (2017) ("guns, unlike drugs, are likely to be kept in an individual's home"). United States v. Smith, 182 F.3d 473, 480 (6th Cir. 1999) ("Courts have acknowledged that individuals who own guns keep them at their homes."); United States v. Rahn, 511 F.2d 290, 293-94 (10th Cir. 1975) (despite no observations of guns at residence, there was a sufficient nexus between firearms and residence because "it is pretty normal . . . for individuals to keep weapons in their homes.")

the trial court did not err in concluding there was a sufficient nexus between the alleged violation and the location of the search, i.e. Mai's residence.

The cases cited by Mai are distinguishable. Several involved the absence of a nexus between a location and a failure to report violation.[13] While "there is no nexus between property and [a] failure to report" violation, there was no failure to report in this case.[14] State v. Goble[15] does not help Mai because Goble was not a supervisee/probationer with a diminished expectation of privacy, and the nexus issue in that case involved drugs that might or might not have ended up at the residence police wanted to search.[16] Similarly, State v. Thein,[17] like Goble, did not involve a supervisee/probationer with a diminished expectation of privacy. Moreover, in concluding there was no nexus between the items to be seized and the suspect's residence, the court specifically exempted "personal items of continuing utility", noting that in "specific circumstances it may be reasonable to infer such items will likely be kept where the person lives."[18]

State v. Yonker[19] is also inapposite. There, the court found a nexus supporting a residential search for ammunition and firearms based on a bullet found outside of the probationer's residence. While the discovery of ammunition

[13] Cornwell, 190 Wn. 2d 296, State v. Jardinez, 184 Wn. App. 518, 528, 338 P.3d 292 (2014); State v. Lippincott, No. 71522-4-I, slip. Op. at 2 (Wash. Ct. App. June 29, 2015) (unpublished), http://www.courts.wa.gov/opinions/pdf/715224.pdf.
[14] Cornwell, 190 Wn. 2d at 306.
[15] State v. Goble, 88 Wn. App. 503, 512, 945 P.2d 263 (1997).
[16] Goble, 88 Wn. App. at 508.
[17] State v. Thein, 138 Wn.2d 133, 977 P.2d 582 (1999).
[18] Thein, 138 Wn.2d at 148-49, 149 n4.
[19] State v. Yonker, No. 49306-3-II (Wash. Ct. App. Feb. 21, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2049306-3-II%20Unpublished%20Opinion.pdf.

so close to Yonker's residence strongly linked the residence to the suspected community custody violations, the Yonker court did not hold that the strength of that evidence created an evidentiary baseline for establishing a nexus.

For the first time in his reply brief, Mai contends a nexus cannot exist between a firearm and a residence unless "the defendant used the weapon to commit an additional crime . . . and the defendant lacks knowledge that witnesses have informed law enforcement of the defendant's involvement in the crime." We need not address arguments raised for the first time in reply.[20]

Mai also contends the search lacked a sufficient nexus and/or was unlawful because the information precipitating the search was stale by the time Officer D'Souza searched his home 54 days after the incident at the Casino. The test for staleness is a "commonsense" determination of whether the facts support a conclusion that the property sought is likely still on the premises to be searched.[21] In making this determination, courts consider the totality of the circumstances, including the passage of time and the nature of the suspected criminal activity.[22]

Courts have recognized that firearms tend be held for long periods of time, while consumable items, like drugs, are likely to be consumed or sold at a much

---

[20] King v. Rice, 146 Wn. App. 662, 673, 191 P.3d 946 (2008). In addition, Mai's factual claim in his reply brief that he knew Casino staff "had reported his alleged possession of a firearm to the Washington state Gambling Commission" is not supported by any reference to the record. While evidence to that effect was presented in a declaration for the first time on reconsideration, it is unclear whether the court exercised its discretion to consider it. Furthermore, while the new evidence indicated that Mai knew the Gambling Commission was aware of his possession of a firearm, it did not indicate that Mai knew the Commission reported that information to Mai's CCO or local law enforcement.

[21] Bohannon, 62 Wn. App. 462, 470, 814 P.2d 694 (1991).

[22] State v. Maddox, 152 Wn.2d 499, 506, 98 P.3d 1199 (2004).

faster rate.[23]  And as previously noted, firearms are likely to be kept in a person's residence.  Under the totality of the circumstances presented here, we conclude there was a sufficient likelihood that Mai's firearm would still be found on his premises 54 days after he possessed it at the casino.

Affirmed.

_____
Mann, A.C.J.

_____
Appelwick, C.J.

_____
Leach, J.

[23] State v. Groves, No. 32961-5-III at *35 ("guns, unlike drugs, are likely to be kept in an individual's home and are kept for longer periods of time"); United States v. Houston, 965 F. Supp. 2d 855, 905 (E.D. Tenn. 2013) (although firearms were observed more than a year before search warrant was sought, "guns have an enduring value to those who possess them and are likely to be retained for long periods of time."); United States v. Powell, 603 Fed.Appx. 475, 478 (6th Cir. 2015) (despite eight-month time lag, evidence was not stale in part because firearms are durable goods that tend to remain in owner's possession for a long period of time); United States v. Harju, 466 F.3d 602, 608 (7th Cir. 2006) (although three weeks passed between the gun's sighting and the warrant's execution, the gun, unlike drugs or cash, "was not likely to have been sold (or consumed) during that period"); United States v. Singer, 943 F.2d 758, 763 & n. 7 (7th Cir.1991) (anonymous report alleging defendant possessed handguns six months before police investigated was not stale because "firearms, unlike drugs, are durable goods useful to their owners for long periods of time"); United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975) (upholding warrant issued nearly 3 months after bank robbery because "people who own pistols generally keep them at home or on their persons.").